**Affirmed in part and Abated; Opinion Filed August 25, 2015.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-14-00697-CR

**ALLEN MAURICE LITTLE, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the Criminal District Court No. 7**
**Dallas County, Texas**
**Trial Court Cause No. F-0951721-Y**

## MEMORANDUM OPINION

Before Justices Bridges, Francis, and Lang
Opinion by Justice Lang

Appellant Allen Maurice Little appeals his conviction for aggravated assault. *See* TEX. PENAL CODE ANN. §§ 22.01 (West Supp. 2014), 22.02(a) (West 2011). Following a trial, a jury found Little guilty, assessed punishment at thirty months' imprisonment, and recommended community supervision. The trial court suspended the imposition of sentence and placed him on community supervision for thirty months. In three issues on appeal, Little argues: the evidence is insufficient to prove (1) he committed aggravated assault and (2) he was not justified in using force or deadly force in defense of his person; and (3) the trial court erred in ordering him to pay restitution in the amount of $274,155.07. We decide against Little on his first two issues, and we affirm the conviction for aggravated assault. We decide in favor of Little on his third issue. We

set aside the amount of restitution, abate the appeal, and remand the case to the trial court for a hearing to determine a just amount of restitution.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Little was charged by indictment with aggravated assault causing serious bodily injury by striking Edward "Jim" Arnold with Little's hand, a deadly weapon, and by forcing Arnold to and against the floor, a deadly weapon, with Little's hand. *See* TEX. PENAL CODE ANN. §§ 22.01, 22.02(a). Little pleaded not guilty and was tried by a jury.

The trial testimony reflects that on the night of December 23, 2008, and into the early hours of December 24, 2008, Little and two of his friends, John Williams and Daniel Forslund, were at a bar in Dallas. The complainant, Arnold, was at the same bar with Christopher Hall, who was also a friend or acquaintance of Little. All five men were drinking that night. The assault occurred at approximately 1:45 or 2:00 a.m. on December 24, 2008, when Little was closing out his bar tab.

Jordan Lowery, the bartender and assistant manager of the bar, testified that during "last call," which is generally at 1:45 a.m., he heard a "noise" or "commotion." When he turned, he saw "someone fall backward and somebody not follow through." Then, he saw three men "running" out of the door.

Williams testified that he heard Arnold yelling at Little and heard Arnold say "something about the only reason that you're here is because your grandfather raped your grandmother." Williams turned to look at Forslund and then heard fighting. When he looked back, "the fight was over," and Arnold was on the floor. Forslund testified that Little and Arnold were in an argument at the bar and that he heard Arnold make an "obscene" or "vulgar" comment about Little's heritage. According to Forslund's testimony, he saw Arnold "lunge" or reach towards

Little and Little move backwards. Forslund stated that from what he observed, Little was defending himself, but Forslund did not see Little actually hit Arnold.

Hall testified that he was intoxicated at the time of the assault. He stated that he was looking at his beer, rather than paying attention to Little and Arnold. Hall did not remember what Little and Arnold were talking about, did not see Arnold move towards Little, and did not see or hear the assault. According to Hall, Little "brushed past" him, and when he turned towards Arnold, Arnold was "falling on the floor." Hall turned again and saw Little, Forslund, and Williams "running out the door." Then Hall went to check on Arnold, who was still on the floor. Hall testified that Arnold was "passed out" on the floor for "maybe 30 seconds," and when he woke up, he was off balance and did not know where he was. Later at Hall's apartment, Arnold had a seizure and began bleeding from the nose. Hall called the paramedics, and Arnold was taken to the hospital. Hall explained that since the assault, Arnold walks differently, wears implants to hear, and his head is "lopsided" because a portion of his skull had to be removed.

Arnold testified that he was in a coma from December 24, 2008, until January 22, 2009 and he does not have any memory of the assault or the day leading up to it. According to Arnold, when he "woke up," he had trouble hearing, he could not stand or walk, and four or five of his front teeth were broken. Arnold was released from the hospital on February 14, 2009. He testified that he has had multiple surgeries, his memory is "pretty bad," he has vertigo and trouble with balance, which requires him to walk with a cane, and he has seizures, which prevent him from driving a car.

Dr. Caetano Coimbra, the neurosurgeon who treated Arnold, testified that during his initial assessment at the hospital Arnold was a 6 on the Glasgow coma scale. He explained that the Glasgow coma scale grades coma patients "from 3 to 15 according to the seriousness of the

injury," and 3 represents the lowest level of verbal response, motor reaction, and eye opening. Dr. Coimbra stated that at a 6, Arnold "was in a deep level of coma."

Dr. Coimbra testified that Arnold had "severe traumatic brain injury." He described a CT scan of Arnold's head, taken at 4:50 a.m. on December 24, 2008, that showed three types of trauma. First, the CT scan showed soft tissue trauma "around the eye socket injury" and on the back right of his head, indicating he "likely fell or hit his head against the floor and that caused a hematoma." Second, the CT scan reflected brain trauma or contusions on both frontal lobes. The injury to the left side of Arnold's brain was "bigger than the right," which indicated that Arnold had "shift," "meaning because there was this increased pressure on the left side, the brain was shifting to the right." Dr. Coimbra explained, "Arnold got hit on the left side here and then he likely fell, he hit the right side of the back of his head. Now the brain is like a jelly. . . . [W]hen he hit the back of his head then the brain went forward and the front part hit the bone and that then caused the trauma on both frontal lobes." Finally, the CT scan also showed fractures to Arnold's head. He had a fracture on the right back of the head and fractures to both temporal bones, which "are related to the hearing." According to Dr. Coimbra, the force from the trauma to the back of his head "transmitted towards the base of the skull which then transmitted to both sides and then it fractured [both temporal bones]." Because the bone injury "fractured through the cochlear" or "inner ear," it caused Arnold to lose his sense of hearing. Based on his experience and the injuries to Arnold's head, Dr. Coimbra opined it would be "unusual" for Arnold's injuries to be the result of "just a fall." He also testified that Arnold could have died from these injuries.

According to Dr. Coimbra, Arnold's brain injury was "a big contusion of the brain," and it elevated the intracranial pressure inside Arnold's head. To control the intracranial pressure, Dr. Coimbra performed surgery on the left side of Arnold's head to remove "the front part of the

–4–

contusion" and a "large portion of the skull." About eight months later, when Dr. Coimbra replaced the piece of skull that had been removed, Arnold developed an infection. Consequently, Dr. Coimbra had to perform a third surgery to again remove the piece of skull and replace it with a cement prosthesis.

Dr. Mary Carlile, a physician and physical medicine and rehabilitation specialist, treated Arnold for approximately four to six weeks in the hospital. She testified that Arnold's injuries were life-threatening, caused him permanent memory, coordination, and hearing loss, and caused him permanent disfigurement as a result of removing a portion of his skull.

Finally, Little testified in his own defense. According to Little, when he approached the bar to pay his tab, he spoke with Hall and Arnold, who were seated at the bar. During this time, Hall, who was seated in between Arnold and Little, "muttered something about taxes," and Little responded "we all got to pay our part, you know, just kind of joking." Little testified that Arnold then stood up on his stool's foot rail, leaning over Hall, and "screams that he's a Puerto Rican." Little replied, "Okay. I don't know what that means, but if it matters to you, I'm half Cherokee." Arnold sat back down for a second, stood back up, got "even closer" to Little, and said, "You're only here because your god damned grandfather raped your fucking grandmother." According to Little, Arnold then "just lunged off the bar with his hand out toward [Little], and [Little] hit him." Little stated that Arnold was "just inches" away and he thought Arnold was "in the process" of assaulting him. Little testified that after he hit Arnold, Arnold "grabbed [his] lapels and started . . . pulling [him] back," so Little hit him again. According to Little, both times he punched Arnold around the left eye and in response to Arnold's actions. After being hit the second time, Arnold let go of Little, stood with "this quizzical look on his face and just kind of stopped and started to walk towards the bathroom." Little stated he then saw Arnold "take two

steps, trip[ ], [and] fall[]," hitting the back of his head on the floor. Little rejoined Williams and Forslund, and the three men left the bar.

The jury found Little guilty of aggravated assault causing serious bodily injury, while using a deadly weapon, assessed punishment at thirty months' imprisonment, and recommended community supervision. The trial court suspended imposition of sentence, and placed Little on community supervision for thirty months. After a hearing, the trial court ordered Little to pay Arnold restitution in the amount of $274,155.07 as a condition of his community supervision.

## II. SUFFICIENCY OF THE EVIDENCE

In issue one, Little argues the evidence is insufficient to support his conviction for aggravated assault because he did not cause Arnold's serious bodily injury and did not intend to cause serious bodily injury. In issue two, Little argues the evidence is insufficient to show he was not justified in using force or deadly force in defense of his person. The State responds that the evidence is sufficient to support Little's conviction and the jury's rejection of his self-defense claim.

### A. Standard of Review

In determining the sufficiency of the evidence, we view all the evidence in the light most favorable to the verdict to determine whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 318–19; *Dobbs v. State*, 434 S.W.3d 166, 170 (Tex. Crim. App. 2014). When the issue of self-defense is raised before the trier of fact, the reviewing court determines, viewing the evidence in the light most favorable to the verdict, not only whether the trier of fact could have found the essential elements of the offense beyond a reasonable doubt, but also whether the trier of fact could have found against appellant on the self-defense issue beyond a reasonable doubt. *See Saxton v. State*, 804 S.W.2d 910, 914 (Tex. Crim. App. 1991). "Circumstantial evidence is as

–6–

probative as direct evidence in establishing the guilt of the actor, and circumstantial evidence alone may be sufficient to establish guilt." *Dobbs*, 434 S.W.3d at 170 (citing *Carrizales v. State*, 414 S.W.3d 737, 742 (Tex. Crim. App. 2013)).

The jury is the sole judge of credibility and weight to be attached to the testimony of witnesses, and "can choose to believe all, some, or none of the testimony presented by the parties." *Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991). We "may not re-evaluate the weight and credibility of the record evidence and thereby substitute our judgment for that of the fact-finder." *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007) (quoting *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999)). When the record supports conflicting inferences, we presume that the jury resolved the conflicts in favor of the verdict, and we defer to that determination. *Jackson*, 443 U.S. at 326; *Dobbs*, 434 S.W.3d at 170.

### B. Applicable Law

A person commits assault if he "intentionally, knowingly, or recklessly causes bodily injury to another." TEX. PENAL CODE ANN. § 22.01(a)(1). A person commits aggravated assault if the person commits an assault as defined in section 22.01 and the person either (1) causes serious bodily injury to another or (2) uses or exhibits a deadly weapon during the commission of the assault. *Id.* §§ 22.01, 22.02(a). Bodily injury means "physical pain, illness, or any impairment of physical condition." *Id.* § 1.07(a)(8) (West Supp. 2014). Serious bodily injury means "bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." *Id.* § 1.07(a)(46).

A deadly weapon is "anything that in the manner of its use or intended use is capable of causing death or serious bodily injury." *Id.* § 1.07(a)(17)(B). The State may prove that "any

object" is a deadly weapon "by adducting sufficient evidence that it was, in fact, 'manifestly designed, made, or adapted for the purpose of inflicting death or serious bodily injury.'" *Thomas v. State*, 821 S.W.2d 616, 620 (Tex. Crim. App. 1991) (quoting *Walker v. State*, 543 S.W.2d 634, 636 (Tex. Crim. App. 1976)). "[I]t is not necessary to verify that the object was really capable of causing death, either in the manner of its actual use or in the manner of its intended use." *Id.* Depending upon the evidence shown, both a hand and the ground can be deadly weapons. *Lane v. State*, 151 S.W.3d 188, 191 (Tex. Crim. App. 2004) (concluding a hand can be a deadly weapon); *McCallum v. State*, 311 S.W.3d 9, 18 (Tex. App.—San Antonio 2010, no pet.) (citing *Johnston v. State*, 150 S.W.3d 630, 639 (Tex. App.—Austin 2004, no pet.)) (stating a hand and the ground can be deadly weapons). The injuries, if any, inflicted on the victim are factors to be considered in determining whether an object was used as a deadly weapon. *Lane*, 151 S.W.3d at 191.

A person acts intentionally "when it is his conscious objective or desire to engage in the conduct or cause the result." *Id.* § 6.03(a) (West 2011). A person acts knowingly "with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result." *Id.* § 6.03(b). A person acts recklessly "when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur." *Id.* § 6.03(c). Direct evidence of the requisite intent is not required. *Hart v. State*, 89 S.W.3d 61, 64 (Tex. Crim. App. 2002). Intent may be inferred from circumstantial evidence, such as the acts, words, and conduct of the accused. *Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004).

"[A] person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force." TEX. PENAL CODE ANN. § 9.31(a) (West 2011). "A person

is justified in using deadly force against another when and to the degree he reasonably believes the deadly force is immediately necessary to protect himself against the other's use or attempted use of unlawful deadly force." *Id.* § 9.32(a) (West 2011). Self-defense is a defense to prosecution. *See id.* §§ 2.03, 9.02 (West 2011). When a defendant raises self-defense, the State has the final burden of persuasion to disprove it. This is not a "burden of production, i.e. one requiring the State to affirmatively produce evidence refuting the self-defense claim, but rather a burden requiring the State to prove its case beyond a reasonable doubt." *Saxton*, 804 S.W.2d at 913. The issue of self-defense is an issue of fact to be determined by the jury. *Id.*

### C. Application of the Law to the Facts

#### 1. Aggravated Assault

In issue one, Little first argues that the evidence is insufficient to prove that his punching Arnold caused Arnold's serious bodily injury. Little testified that he punched Arnold twice around the left eye, and then Arnold walked away, tripped, and fell to the ground. Accordingly, Little argues that Arnold's fall to the ground after tripping caused his serious bodily injury.

Hall testified that Arnold was "passed out" for approximately thirty seconds after the assault. When he woke up, he was off balance and did not know where he was. Later that night, Arnold had a seizure and bled from the nose. Finally, Hall stated that since the assault, Arnold walks differently, wears implants to hear, and his head is "lopsided."

Arnold testified that he was in a coma from December 24, 2008, until January 22, 2009. He stated that he was hospitalized until February 14, 2009, and had undergone multiple surgeries. According to Arnold, he now has memory and hearing problems. He also has vertigo and trouble with balance, requiring him to use a cane to walk, and he suffers from seizures, which prevent him from driving a car. Dr. Coimbra explained that Arnold had soft tissue trauma around his eye socket and on the back of his head, contusions on both frontal lobes of his brain,

and fractures one the back right portion of his skull and both temporal bones. To control the pressure caused by the brain trauma, Dr. Coimbra had to surgically remove a "large portion" of Arnold's skull. When that portion of Arnold's skull was replaced months later, Arnold developed an infection. Consequently, Arnold required a third surgery to again remove the bone and replace it with a cement prosthesis. Dr. Coimbra testified that these injuries could have killed Arnold. Additionally, Dr. Carlile, the physical medicine and rehabilitation specialist who treated Arnold, testified that Arnold's injuries were life-threatening, caused him permanent memory, coordination, and hearing loss, and caused him permanent disfigurement as a result of removing a portion of his skull. Accordingly, Arnold's injuries constituted serious bodily injury. *See* TEX. PENAL CODE ANN. §§ 1.07(a)(8), 1.07(a)(46).

Aggravated assault causing serious bodily injury "necessarily implies the use of a deadly weapon." *Blount v. State*, 257 S.W.3d 712, 714 (Tex. Crim. App. 2008). As discussed above, Arnold suffered serious bodily injury, which required multiple surgeries, permanently impaired his memory, coordination, and hearing, and caused him permanent disfigurement. *See Lane*, 151 S.W.3d at 191 (recognizing that injuries inflicted on the victim are factors to be considered in determining whether an object was used as a deadly weapon). Little testified that he punched Arnold twice in the head. *See id.* (concluding a hand can be used as a deadly weapon). Lowery testified that after he heard a "noise" or "commotion," he turned and saw "someone fall backward and somebody not follow through." Williams testified that he "heard some fighting," and when he looked back at Little, "the fight was over," and Arnold was on the ground. *See Johnston*, 150 S.W.3d at 639 (concluding the floor can be used as a deadly weapon). The jury was entitled to assess the credibility and demeanor of the witnesses who testified at trial. *See Dobbs*, 434 S.W.3d at 170. Viewing the evidence in the light most favorable to the prosecution, we conclude that "any rational trier of fact" could have found beyond a reasonable doubt that

Little caused Arnold serious bodily injury by using his hand and the floor as deadly weapons. *See id.*; *Lane*, 151 S.W.3d at 191; *Johnston*, 150 S.W.3d at 639.

Little next argues the evidence is insufficient to show that he intended the specific result of serious bodily injury and at most intended bodily injury, a misdemeanor. To prove aggravated assault, the State was required to show that Little intentionally, knowingly, or recklessly committed an assault that caused serious bodily injury, and used a deadly weapon. *See* TEX. PENAL CODE ANN. §§ 22.01, 22.02(a); *Landrian v. State*, 268 S.W.3d 532, 537–38 (Tex. Crim. App. 2008) ("The gravamen of the offense of aggravated assault is the specific type of assault defined in Section 22.01. . . . Aggravated assault increases the penalty for simple 'bodily injury' assault if the victim suffers a significantly greater degree of bodily harm—serious bodily injury, rather than mere bodily injury."); *Butler v. State*, 928 S.W.2d 286, 288 (Tex. App.—Fort Worth 1996, pet. ref'd) (concluding a "second" culpable mental state was not required in connection with the deadly weapon element in conviction for aggravated assault because "[i]t is clear from the statutory definition of aggravated assault that the culpable mental states of intent, knowledge, and recklessness relate to the assault element of causing bodily injury to another").

Viewing the evidence in the light most favorable to the prosecution, Little punched Arnold twice in the head, causing Arnold to fall to the floor and hit his head. Then Little "ran" out of the bar, leaving Arnold on the floor. *See Clayton v. State*, 235 S.W.3d 772, 780 (Tex. Crim. App. 2007) (recognizing that "a factfinder may draw an inference of guilt from the circumstance of flight). The jury could have reasonably inferred Little's intent to cause bodily injury from Little's act of punching Arnold in the head twice. *See Guevara*, 152 S.W.3d at 50; *Fancher v. State*, No. 10-09-00121-CR, 2011 WL 1166657, at *3 (Tex. App.—Waco Mar. 30, 2011, pet. ref'd) (not designated for publication) (concluding appellant's intent to cause bodily injury could reasonably be inferred from appellant's act of striking complainant in the head). Dr.

–11–

Coimbra testified it would be unusual that these extensive injuries were caused only by the fall to the floor. The jury could rationally have concluded that the punches to Arnold's head knocked him to the floor where he hit the back of his head, and that the combination of the two caused the serious brain injuries. Further, the evidence presented established Little's hands and the floor of the bar were used in a manner that made them deadly weapons. We conclude that "any rational trier of fact could have found the essential elements of [aggravated assault] beyond a reasonable doubt." *See Dobbs*, 434 S.W.3d at 170. We decide against Little on his first issue.

## 2. Self-Defense

In issue two, Little argues the evidence is insufficient to prove that he was not justified in using force or deadly force in defense of his person. Little testified that while he was closing his bar tab, Hall "muttered something about taxes," and Little "joking[ly]" responded "we all got to pay our part." Arnold then "scream[ed] that he's a Puerto Rican." According to Little, when he replied that he was half-Cherokee, Arnold said, "You're only here because your god damned grandfather raped your fucking grandmother." Then Arnold "lunged off the bar with his hand out toward [Little], and [Little] hit him" in the head around his left eye. Little testified that Arnold next "grabbed" the lapels of his jacket and started "pulling [Little] back," so Little hit Arnold again around his left eye.

Little's testimony alone does not prove his intent was to defend himself. *See Sells v. State*, 121 S.W.3d 748, 754 (Tex. Crim. App. 2003) (concluding defendant's own statement of intent alone did not render evidence factually insufficient). His self-defense claim was supported by Forslund's testimony that he saw Arnold "lunge" at Little and that Little was defending himself. However, Forslund also testified that he gave a written witness statement in February of 2009, which contradicted his trial testimony. In the statement, Forslund stated that he saw Little hit Arnold with his fist and did not mention self-defense or Arnold "lunging" at Little. The jury

–12–

did not have to accept Little or Forslund's testimony concerning self-defense. *See Chambers*, 805 S.W.2d at 461 ("As factfinder, the jury is entitled to judge the credibility of witnesses, and can choose to believe all, some, or none of the testimony presented by the parties.").

Additional evidence in the record supports the jury's verdict and the jury's rejection of Little's self-defense claim. Williams, Forslund, and Little indicated that the altercation occurred after Arnold made an insulting comment about Little's heritage. Additionally, all witnesses indicated that Little, Williams, and Forslund immediately left or "ran" out of the bar after the altercation. *See Clayton*, 235 S.W.3d at 780 (recognizing that "a factfinder may draw an inference of guilt from the circumstance of flight"). Dallas police detective Rudy Contreras, who was assigned this case in December of 2008, testified that none of the individuals he interviewed in the weeks following the incident indicated that Little was acting in self-defense.

The existence of contrary evidence is not enough to support a finding of factual insufficiency. *Lee v. State*, 186 S.W.3d 649, 655–56 (Tex. Crim. App. 2006). We must presume that the jury resolved the conflicts in favor of the prosecution and defer to that resolution. *See Dobbs*, 434 S.W.3d at 170. Because the jury, by finding Little guilty, implicitly rejected his self-defense theory, it necessarily chose not to believe the testimony concerning Little's self-defense theory. *See Chambers*, 805 S.W.2d at 461; *see also Smith v. State*, 352 S.W.3d 55, 63 (Tex. App.—Fort Worth 2011, no pet.) (concluding evidence was sufficient to support conviction for assault despite appellant's claim of self-defense, which was based on testimony of appellant and other witnesses who challenged the credibility of the complainant and showed that complainant had been "physically aggressive in the past"); *Thrower v. State*, No. 05-07-00730-CR, 2008 WL 963161, at *6 (Tex. App.—Dallas Apr. 10, 2008, no pet.) (not designated for publication) (concluding evidence was sufficient to support assault conviction despite appellant's testimony that he "merely 'pushed' complainant away in self-defense" after complainant "uttered a racial

slur and pushed [appellant] first"). Viewing the evidence in the light most favorable to the prosecution, we conclude that "any rational trier of fact" could have concluded that Little did not use force against Arnold because he reasonably believed the force was immediately necessary to protect himself against the use or attempted use of unlawful force by Arnold. The State refuted the claim of self-defense by proving the elements of aggravated assault with a deadly weapon causing seriously bodily injury beyond a reasonable doubt. *See Saxton*, 804 S.W.2d at 914; *Smith*, 352 S.W.3d at 63; *Thrower*, 2008 WL 963161, at *6. We decide against Little on his second issue.

Having concluded the evidence is sufficient to support the jury's finding of guilt and its rejection of Little's self-defense claim, we affirm the conviction. We now turn to Little's issue regarding restitution.

### III. RESTITUTION

#### A. Standard of Review

We review a trial court's order of restitution for an abuse of discretion. *Cartwright v. State*, 605 S.W.2d 287, 289 (Tex. Crim. App. 1980); *Garza v. State*, 841 S.W.2d 19, 23 (Tex. App.—Dallas 1992, no pet.). "A trial court abuses its discretion if no reasonable view of the record could support the trial court's ruling." *Riley v. State*, 378 S.W.3d 453, 457 (Tex. Crim. App. 2012).

#### B. Applicable Law

In addition to any fine authorized by law, the trial court may order a defendant convicted of an offense to make restitution to any victim of the offense. TEX. CODE CRIM. PROC. ANN. art. 42.037(a) (West 2006). Whether to order restitution is "within the sound discretion of the trial court." *Cartwright*, 605 S.W.2d at 289. "The amount of restitution must be just, and it must have a factual basis within the loss of the victim." *Campbell v. State*, 5 S.W.3d 693, 696 (Tex.

Crim. App. 1999); *id.* (holding that due process requires evidence in the record to show that the amount of restitution set by the trial court has a factual basis). "The proper procedure where the amount of restitution ordered as a condition of community supervision is not supported by the record is to abate the appeal, set aside the amount of restitution, and remand the case for a hearing to determine a just amount of restitution." *Barton v. State*, 21 S.W.3d 287, 290 (Tex. Crim. App. 2000) (citing *Cartwright*, 605 S.W.2d at 289).

### C.  Application of the Law to the Facts

Little argues the trial court erred in ordering restitution in the amount of $274,155.07 because (1) there is no factual basis for the amount of restitution ordered; (2) no evidence was admitted showing the amount of medical expenses incurred by Arnold; and (3) the trial court cannot order Little to pay restitution for an amount for which Arnold will be reimbursed or compensated. The State agrees that the evidence is insufficient to support the restitution order.

A restitution hearing was held in the trial court. However, the record contains no evidence demonstrating the basis for the amount of restitution ordered. Accordingly, the evidence is insufficient to establish a factual basis for the trial court's order of restitution. We conclude the trial court abused its discretion in ordering Little to pay restitution in the amount of $274,155.07. *See Cartwright*, 605 S.W.2d at 288–89 (concluding the trial court abused its discretion in ordering restitution because there was no record evidence to support the amount ordered by the trial court). We decide Little's third issue in his favor.

"The proper procedure where the amount of restitution ordered as a condition of community supervision is not supported by the record is to abate the appeal, set aside the amount of restitution, and remand the case for a hearing to determine a just amount of restitution." *Barton*, 21 S.W.3d at 290 (citing *Cartwright*, 605 S.W.2d at 289). Accordingly, we set aside the

–15–

amount of restitution, abate the appeal, and remand the case to the trial court for a hearing to determine a just amount of restitution. *See id.*

## IV.  CONCLUSION

We affirm the trial court's conviction for aggravated assault.  The trial court erred in ordering Little to pay restitution in the amount of $274,155.07.  We set aside the amount of restitution, abate the appeal, and remand the case for a hearing to determine a just amount of restitution.  *See Barton*, 21 S.W.3d at 290.

/Douglas S. Lang/
DOUGLAS S. LANG
JUSTICE

Do Not Publish
TEX. R. APP. P. 47.2(b).
140697F.U05